IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LUIS ARROYO-RUIZ,

    **Plaintiff**,

        **v.**                  **Civil No.** 15-1741 (FAB)

TRIPLE-S MANAGEMENT GROUP, *et al.*,

    **Defendants.**

## OPINION AND ORDER

BESOSA, District Judge.

    Plaintiff Luis Arroyo-Ruiz ("Arroyo-Ruiz") brought this action against defendants alleging violations of the Americans with Disabilities Act ("ADA"), and Title VII of the Civil Rights Act of 1964 ("Title VII").[1]  Plaintiff also invokes the supplemental jurisdiction of the Court to adjudicate his claims pursuant to Puerto Rico state laws, Puerto Rico Law 100 ("Law 100"), P.R. Laws Ann. tit. 29, §§ 146 *et seq.*; Puerto Rico Law No. 115 ("Law 115"), P.R. Laws Ann. tit. 29, § 194 *et seq.*; Puerto Rico Law 80 ("Law 80"), P.R. Laws Ann. tit. 29, §§ 185a–185m; and Articles 1802 and 1803 of the Civil Code of Puerto Rico ("Articles 1802 & 1803"), P.R. Laws Ann. tit. 31, §§ 5141, 5142.  (Docket No. 32.)

---

[1] Although plaintiff's initial complaint included a cause of action arising under the Age Discrimination in Employment Act (ADEA), that claim was omitted in the amended complaint.  Accordingly, the Court will not address ADEA claims here.  Rather, plaintiff's claims of discrimination, retaliation, and hostile work environment in violation of the ADA and Puerto Rico law form the essential focus of the Court's scrutiny and analysis.

Defendants Triple-S Vida, Inc. ("Triple-S Vida"), Triple-S Insurance Co. ("Triple-S Insurance"), and Triple-S Management Group ("Triple-S Management") move to dismiss plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (Docket Nos. 20 at pp. 2-3; 33.)  In addition, defendants move for the dismissal of all claims against Triple-S Insurance and Triple-S Management pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), arguing that plaintiff failed to exhaust administrative remedies as required by law.  (Docket Nos. 20 at p. 2; 33.)  Plaintiff opposes.  (Docket No. 29.)  For the reasons explained below, the Court **DENIES** defendants' Rule 12(b)(1) motion and **GRANTS IN PART and DENIES IN PART** defendants' Rule 12(b)(6) motion.

## I.   STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), defendants may move to dismiss an action for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The Court must decide whether the complaint alleges sufficient facts to "raise a right to relief above the speculative level." Id. at 555.  In so doing, the Court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. Parker v. Hurley, 514 F.3d 87, 90 (1st. Cir. 2008).  Although "the elements of a

prima facie case may be used as a prism to shed light upon the plausibility of the claim," it is "not necessary to plead facts sufficient to establish a prima facie case" in order to survive a motion to dismiss.  Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 54 (1st Cir. 2013).

Rule 12(b)(1) allows a court to dismiss a complaint when the Court's subject-matter jurisdiction is not properly alleged.  Fed. R. Civ. P. 12(b)(1).   The standard applied to a Rule 12(b)(1) motion is similar to that of a Rule 12(b)(6) motion because the Court accepts the complaint's well-pled facts as true and views them - and the inferences drawn from them - in a light most favorable to the pleader.  See Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998); see also Soto v. McHugh, Civil No. 13-1507, 2016 WL 236216, at *6 (D.P.R. Jan. 20, 2016) (Gelpi, J.).   Thus, "[a] district court must construe the complaint liberally." Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996).

## II.   FACTUAL ALLEGATIONS IN THE AMENDED COMPLAINT

The Court takes the following facts as true, as pled in plaintiff's amended complaint:

Prior to his termination, Arroyo-Ruiz worked for Triple-S Insurance for thirty-five years.  (Docket No. 32 at p. 4.)   During that time, he held various positions within the company.  Id. Arroyo-Ruiz's health began to decline in 2005 after suffering an episode of cardiac arrest.  Id.  The company then transferred Arroyo-Ruiz to various office locations.  Id.  In 2008, Arroyo-Ruiz

was transferred to the Arecibo office, where he served as a staff supervisor overseeing four insurance agents. Id. Arroyo-Ruiz was placed under the direction of Carlos Rodriguez ("Rodriguez"). Id. at pp. 4-5. Although Arroyo-Ruiz had considerable success as a supervisor - his team had the best performance record in the district - Rodriguez told Arroyo-Ruiz that Arroyo-Ruiz's staff could become the highest performing team in the company if they worked under a younger staff supervisor. Id. at p. 4.

In March 2011, Arroyo-Ruiz became disoriented at work and fell to the ground. (Docket No. 32 at p. 4.) Arroyo-Ruiz's dizziness was attributed to an obstruction in his carotid artery. Id. This illness required Arroyo-Ruiz to take six weeks of sick leave. Id. Following Arroyo-Ruiz's time away from work, he would regularly hear from co-workers that Rodriguez and other staff members would comment on his worsening health. Id. at p. 5. Additionally, any of plaintiff's co-workers who defended him would be ridiculed. Id.

On December 21, 2012, Arroyo-Ruiz underwent surgery for the insertion of a pacemaker. (Docket No. 32 at p. 5.) While Arroyo-Ruiz was recovering from the operation, he was notified by a co-worker that he had been reassigned to supervise new staff. Id. Arroyo-Ruiz wrote to Triple-S Company Director Edgar Diaz, Triple-S President Arturo Carrion, Human Resource Manager Mara Santiago and Rodriguez asking that he not be reassigned. Id. All responded by telling Arroyo-Ruiz that Rodriguez had the authority to reassign him. Id. Arroyo-Ruiz then contacted Agency Director Francisco

Rivera and requested a review of the reassignment decision.  Id.
Rivera told Arroyo-Ruiz that he had to comply with Rodriguez's
reassignment order or face termination.  Id.

When Arroyo-Ruiz returned to work in February 2013, two
members of his new staff quit, which rendered his team incomplete.
(Docket No. 32 at p. 6.)  Arroyo-Ruiz asked Rodriguez to recruit
agents to fill the vacancies, but Rodriguez responded by telling
Arroyo-Ruiz that it was his duty, as staff supervisor, to recruit
new agents.  Id.  During this time, the negative comments about
Arroyo-Ruiz's health persisted, and Rodriguez would frequently ask
Arroyo-Ruiz to retire or seek a transfer to a different office.
Id.

In July 2013, Rodriguez set a new sales objective for all
staff supervisors.  (Docket No. 32 at p. 6.)  Arroyo-Ruiz told
Rodriguez that it would be "impossible" for him to reach the new
goal because he had only two agents on his staff.  Id.  Rodriguez
responded by saying that any agent that could not reach the new
goal "could go to hell."  Id.  Two days after this confrontation,
Pedro Torres, Triple-S's Vice President, met with Arroyo-Ruiz to
discuss Arroyo-Ruiz's decreasing performance.  Id.  Arroyo-Ruiz
told Torres about his incomplete team and about his disagreement
with Rodriguez regarding the new sales objective.  Id.  Torres did
not take any action to rectify the situation.  Id. at p. 7.
Following the meeting with Torres, Arroyo-Ruiz contacted human
resources and complained that Rodriguez had been harassing him

since he began working at the Arecibo office.  <u>Id.</u>  The human
resources office did not open an investigation.  <u>Id.</u>

In August, 2013, Arroyo-Ruiz was told that his kidneys were
not functioning properly and that he needed to undergo dialysis
treatment.  (Docket No. 32 at p. 7.)  After Arroyo-Ruiz received
this news, he contacted the company's director, Juan Iglesias,
about retiring in 2014.  <u>Id.</u>  A month after contacting Iglesias,
Arroyo-Ruiz was questioned about the reasons for his request for
retirement.  <u>Id.</u>  Arroyo-Ruiz explained the problems surrounding
his work environment and how it was adversely affecting his health.
<u>Id.</u>  Nothing resulted from the conversation.  <u>Id.</u>

In December, 2013, Arroyo-Ruiz was told that he had to use the
thirty-day vacation time he had accumulated.  (Docket No. 32 at
p. 7.)  He requested that his vacation time be divided in half so
that he would be able to visit his daughter in the early part of
2014, before he had to begin dialysis.  <u>Id.</u>  In March, 2014, he was
notified that his vacation was not approved because his staff was
incomplete and leaving was not possible.  <u>Id.</u>  Arroyo-Ruiz then
requested Rodriguez's authorization of his retirement, but
Rodriguez denied the request.  <u>Id.</u>  On April 8, 2014, however,
Rodriguez handed Arroyo-Ruiz papers allowing him to take a two-week
vacation, simultaneously informing Arroyo-Ruiz that he "would no
longer have a staff" upon his return.  <u>Id.</u> at p. 8.  Arroyo-Ruiz
then took his vacation to California to visit his daughter.  <u>Id.</u>
During the trip, he was hospitalized for three days.  <u>Id.</u>  Two days

after leaving the hospital, he was hospitalized again for an additional six days.  Id.  The doctor ordered dialysis treatment and instructed Arroyo-Ruiz that he was not permitted to travel until the dialysis treatment had concluded.  Id.  Following the discharge after his second hospital visit, Arroyo-Ruiz contacted the Arecibo office and informed them of his health issues and asked if he had any remaining sick leave or vacation time.  He was not afforded extended sick leave or vacation time.  See Id.  Rather, he received a letter indicating he had been terminated for insubordination and for having taken vacation without proper authorization.  Id.

After receiving the termination letter, Arroyo-Ruiz filed a complaint with the Equal Employment Opportunity Commission (EEOC) on October 21, 2014.  (Docket No. 20-1.)  In 2015, he brought this action seeking relief pursuant to federal and Puerto Rico law.  See Docket No. 32 at pp. 10-12.

### III.  DISCUSSION

**A.  Exhaustion of Administrative Remedies and Subject Matter Jurisdiction**

**1.  The Parties' Contentions**

Defendants first assert that all claims brought against Triple-S Insurance and Triple-S Management should be dismissed for lack of subject matter jurisdiction because plaintiff failed to exhaust administrative remedies with the EEOC prior to bringing suit.  (Docket No. 20 at p. 10.)  This defect, defendants contend,

results from plaintiff's failure to include both entities as named
parties in his formal charge of discrimination with the EEOC.
Because neither Triple-S Insurance nor Triple-S Management was
named in the administrative proceedings, the defendants conclude,
"plaintiff cannot bring suit against [them]" now in federal court.
Id.   Plaintiff counters by arguing that he "exhausted all
applicable administrative remedies" and further suggests that all
three defendants were not individually named in the charge because
they "perform functions intertwined between themselves and as such
act as a single employer."  (Docket No. 32 at pp. 10, 13.)

        2.   **Analysis**

          In the First Circuit, "a claimant who seeks to recover
for an asserted violation of . . . the ADA, like one who seeks to
recover for an asserted violation of Title VII, first must exhaust
administrative remedies by filing a charge with the EEOC." Bonilla
v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999).
This is because "[c]laims of employment discrimination arising
under the ADA are subject to the same remedies and procedures as
those under Title VII of the Civil Rights Act of 1964 . . . ."
Farris v. Shinseki, 660 F.3d 557, 562 (1st Cir. 2011).  This
statutory pre-requisite "ensures that the defendant has
notification of the pending proceedings, and . . . furthers the
goal of voluntary compliance with Title VII [and the ADA]."
McKinnon v. Kwong Wah Rest., 83 F.3d 498, 505 (1st Cir. 1996).
Consequently, it is a general rule that, if a plaintiff fails to

name an entity in the EEOC charge, he cannot later file a federal lawsuit against that party.  Gonzalez v. Ritz Carlton Hotel Co. of P.R., 241 F. Supp. 2d 142, 145 (D.P.R. 2003) (Casellas, J.).

This rule is not absolute, however, and has been softened by certain exceptions.  McKinnon, 83 F.3d at 505.  One exception provides that a party omitted from an EEOC charge may still be subject to litigation when a "substantial identity" exists between that party and one named in the EEOC charge.  Miranda v. Deloitte, 922 F. Supp. 2d 210, 221 (D.P.R. 2013) (Besosa, J.) (citing McKinnon, 83 F.3d at 505).  Although the First Circuit Court of Appeals has yet to clarify the meaning of "substantial identity" in this context, this Court has found the Third Circuit Court of Appeals' analysis to be compelling.  Id.  In Glus v. G. C. Murphy Co., the Third Circuit Court of Appeals outlined the following four factors for a district court to consider in determining if "substantial identity" exists between the party named in the EEOC charge and the unnamed party that becomes a defendant in the civil action:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

562 F.2d 880, 888 (3d Cir. 1977).

In Miranda, the plaintiff alleged that the defendants named in the civil suit were "integrated entities or a single employer." 922 F. Supp. 2d at 222.   The plaintiff also alleged that the defendants shared the same administrative and related services. Id. at 223.   In assessing whether the "substantial identity" exception could be invoked, this Court applied the Glus factors. The Court concluded that "substantial identity" existed among the defendants because "notice to one will reach the other and no prejudice will result from naming one party but not the other." Id. (quoting Nieves v. Popular, Inc., 2013 WL 361163 at *2 (D.P.R. 2013) (Fuste, J.)).   The Court reasoned that the defendants all shared a common interest because of their legal and operational relationship.  Id. (citing Sedlacek v. Hach, 752 F.2d 333, 334 (8th Cir. 1985)).   Thus, the Court held that "[e]ven if not all defendants were named in plaintiff['s] . . . EEOC administrative charge . . . they me[t] the 'substantial identity' exception sufficient to allow [the] . . . complaint to proceed against them in federal court."  Id.

In this case, like in Miranda, plaintiff contends that defendants' operations are so "intertwined" that they "act as a single employer."  (Docket No. 32 at p. 3.)  Plaintiff further asserts that defendants "have interlocking directorates and are serving the same upper management level." Id. These allegations -

which the Court must accept as true for purposes of a motion to dismiss - are sufficient to support a plausible claim that defendants' corporate operations are so closely related in their activities and management that a "substantial identity" exists among them.  See Miranda, 922 F. Supp. 2d at 223 (citing EEOC v. Upjohn Corp., 445 F.Supp. 635, 638 (N.D. Ga. 1977)).  Because of this putative "substantial identity" among the defendants, plaintiff plausibly exhausted his administrative remedies with the EEOC.  Consequently, subject matter jurisdiction is proper, and plaintiff may maintain his civil action against Triple-S Management and Triple-S Insurance in addition to Triple-S Vida.  Defendants' Rule 12(b)(1) motion to dismiss is therefore **DENIED**.

**B.   ADA Disability Discrimination Claim**

**1.   The Parties' Contentions**

For his first cause of action, plaintiff alleges that he was discriminated against on the basis of disability in violation of the ADA.  (Docket No. 32 at p. 10.)  Defendants argue that plaintiff's ADA claim should be dismissed because the amended complaint fails to plead sufficient facts to raise a plausible entitlement to relief.  Specifically, defendants argue that the complaint is "naked of any allegations that would remotely suggest that plaintiff was disabled within the meaning of ADA; that he was qualified for his job at Triple-S Vida" or that he "was terminated, in whole or in part, because of his disability."  (Docket No. 20 at p. 16.)  For the reasons discussed below, the Court disagrees that

plaintiff's ADA discrimination claim fails to meet the requisite pleading standard and therefore **DENIES** defendants' Rule 12(b)(6) motion with respect to that claim.

### 2. Analysis

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In the employment context, the ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To obtain relief pursuant to ADA, a plaintiff must demonstrate that "(1) he was disabled within the meaning of the Act, (2) he could perform the essential functions of his job, with or without reasonable accommodation, and (3) the employer took adverse action against him, in whole or in part, because of his disability." Roman-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 48 (1st Cir. 2011). Arroyo-Ruiz is not, of course, required to prove these *prima facie* elements in order to survive defendants' motion to dismiss. Rather, his amended complaint must provide sufficient factual allegations for the Court to conclude that they can plausibly be met.

        a.    First ADA Discrimination Element:  Disability

            The disability element can be satisfied by showing
one of three things: (1) "a physical or mental impairment that
substantially limits one or more of the major life activities of
[an] individual"; (2) "a record of such an impairment"; or
(3) "being regarded as having such an impairment."  42 U.S.C.
§ 12102(1).  Plaintiff makes no specific arguments indicating on
which of these three options he is relying to establish that he is
disabled within the meaning of the ADA.   Rather, he simply
identifies four unfortunate problems that he has experienced with
his health over the past decade or so, specifically:   (1) an
episode of cardiac arrest in 2005, (2) an obstruction of his
carotid artery in 2011, (3) the insertion of a pacemaker in order
to address some unidentified issue with his heart in 2012, and
(4) inadequate kidney function leading to dialysis treatment in
2013.  The Court concludes, based on these facts, that plaintiff
seeks to prove his disability by establishing an actual physical
impairment pursuant to the first option set forth in the ADA.

            When a plaintiff alleges an actual physical or
mental impairment under the first option, a three-step test, first
enunciated by the Supreme Court in Bragdon v. Abbott, 524 U.S. 624,
631 (1998), is used to determine whether that impairment actually
renders the plaintiff "disabled" within the meaning of the ADA.
See also Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182, 187 (1st
Cir. 2011).  Pursuant to the Bragdon test, the plaintiff must first

establish that he suffers from a physical or mental impairment.
Ramos-Echevarria, 659 F.3d at 187.  Second, he must demonstrate
that it affects life activities that are "major," i.e., "of central
importance to daily life." Id.  Finally, he must tie the first two
prongs together by showing that the impairment "substantially
limits" the identified major life activity.    Id.    The Court
examines these requirements in turn.

### i.  **Bragdon** Step One:  Impairment

The EEOC, clarifying the ADA, defines physical
impairment as "[a]ny physiological disorder or condition, cosmetic
disfigurement, or anatomical loss affecting one or more body
systems, such as [the] . . . cardiovascular . . . [and]
genitourinary [systems]." 29 C.F.R. § 1630.2(h).  It is true that
plaintiff does not provide much detail regarding his various health
issues.  Nevertheless, between his episode of cardiac arrest, the
blockage of his carotid artery, and the insertion of a pacemaker,
it is plausible that plaintiff suffers from some sort of condition
affecting his cardiovascular system.  See Katz v. City Metal Co.,
87 F.3d 26, 31 (1st Cir. 1996) ("we have no doubt that a rational
jury could conclude . . . that [plaintiff, who suffered a heart
attack,] had a condition affecting the cardiovascular system and
therefore that he had a physical impairment under the ADA.")
Likewise, plaintiff's kidney failure, which necessitated dialysis
treatment, is also likely to qualify as a physical impairment of
the urinary system.  See Fiscus v. Wal-Mart Stores, Inc., 385 F.3d

378, 382 (3d Cir. 2004) (concluding that a kidney ailment requiring dialysis was a physical impairment pursuant to the ADA.)  Thus, because plaintiff suffers from plausible impairments of his cardiovascular and urinary systems, the first Bragdon step is satisfied.

### ii.  **Bragdon Step Two: Effect on Major Life Activities**

Merely having an impairment does not make one "disabled" for purposes of the ADA.  Under the second Bragdon step, a plaintiff must also show that the impairment actually affects one or more "major" life activities.  Bragdon, 524 U.S. at 637 ("[t]he statute is not operative, and the definition not satisfied, unless the impairment affects a major life activity.")  Those activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C.A. § 12102(2)(A).  While plaintiff does not directly discuss a "major life activity" in his amended complaint, certain allegations allow the Court reasonably to infer that several of those activities have been affected by his impairments.  First, he indicates that the blockage of his carotid artery, which could plausibly relate to his heart condition, caused him to experience dizziness and to collapse while working, a life activity that qualifies as "major" under the ADA.  (Docket No. 32 at p. 4.)  Second, although the First Circuit

Court of Appeals has yet to address this specific issue, several other circuit courts have held that kidney impairments that require an individual to seek dialysis treatment affect certain major life activities, including the cleansing of the individual's blood and processing of waste.  See Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 255 (4th Cir. 2006) (holding that "waste elimination" qualifies as a major life activity, and that a kidney impairment requiring dialysis treatment impacts that activity); Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 385 (3d Cir. 2004) (concluding that processing and eliminating waste from the blood qualifies as a major life activity, and that a kidney disease necessitating regular dialysis limited that activity); Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 785 (8th Cir. 2004) (holding that plaintiff who underwent dialysis was "incapable of doing activities of central importance to a person's life, such as cleansing one's own blood cells"); see also Gilbert v. Frank, 949 F.2d 637, 641 (2d Cir. 1991) (noting that "persons whose kidneys . . . do not function sufficiently to rid their bodies of waste matter without regular dialysis" may be "substantially limited in their ability to care for themselves"); McDonald v. Menino, No. CIV. A. 96-10825-RGS, 1997 WL 106955, at *2 (D. Mass. Jan. 3, 1997) (finding that a plaintiff's kidney disease that required her to undergo regular dialysis "clearly" qualified as a disability under the ADA.)

Although plaintiff does not explicitly assert these arguments, the allegations appearing in his amended complaint allow the Court to draw a reasonable inference that his heart and kidney impairments impact several major life activities.  Thus, the second Bragdon step is plausibly satisfied.

### iii. Bragdon Step Three: Whether the Impairments "Substantially Limit" the Identified Major Life Activities

This Court recently explained the substantive effect that the ADA Amendments Act of 2008 ("ADAAA") has had on the third step of the Bragdon test.  See Garcia-Hicks v. Vocational Rehab. Admin., 148 F. Supp. 3d 157, 164 (D.P.R. 2015) (Besosa, J.).  In the ADAAA, Congress chastised the courts for "interpret[ing] the term 'substantially limits' to require a greater degree of limitation than was intended by Congress," thereby "eliminating protection for many individuals whom Congress intended to protect."  Pub. L. No. 110-325, §§ 2(a)(4), (a)(7), (b)(5), 122 Stat. 3553 (stating that the Supreme Court in Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), "created an inappropriately high level of limitation necessary to obtain coverage under the ADA").  The ADAAA also scolded the EEOC for "expressing too high a standard" in its regulations defining the term "substantially limits" to mean "significantly restricted."  Pub. L. No. 110-325, § 2(a)(8), 122 Stat. 3553.  In response to this Congressional reprimand, the EEOC revised the definition of "substantially limits" in the ADA, implementing regulations to remove the

requirement that an impairment "prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." See 29 C.F.R. § 1630.2(j)(1)(ii).  The EEOC's post-ADAAA regulations also state that the term "'substantially limits' is not meant to be a demanding standard," and shall be "broadly construed in favor of expansive coverage[.]"  29 C.F.R. § 1630.2(j)(1)(i).  Finally, those regulations emphasize that the "primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity."  Id. § 1630.2(j)(1)(iii). Consequently, "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."  Id.

        Though the language of the ADAAA and the EEOC's implementing regulations provide important guidance, the task of defining "substantially limits" under the post-ADAAA standard in the context of individual cases still falls to the courts. Unfortunately, there remains a dearth of case law in the First Circuit interpreting the scope and meaning of a "substantial limitation" on a major life activity under the ADAAA.  The Court notes, however, that several post-ADAAA cases in other districts emphasize the low burden at the pleadings stage of litigation.  See Feldman v. Law Enf't Assocs. Corp., 779 F. Supp. 2d 472, 485

(E.D.N.C. 2011) (stating "at this early stage of the proceedings, the court is unwilling to say that [the plaintiff] has failed to sufficiently allege that he had a disability"); Lowe v. Am. Eurocopter, LLC, No. 1:10CV24-A-D, 2010 WL 5232523, at *8 (N.D.Miss. Dec. 16, 2010) ("Whether or not Plaintiff can in fact prove that her weight rises to the level of a disability under the ADA is not at issue here, as a motion to dismiss is not the proper method for evaluating the merits of Plaintiff's specific assertions."  (citing Swierkiewicz, 534 U.S. at 514)); see also Franchi v. New Hampton Sch., 656 F.Supp.2d 252, 259 (D.N.H. 2009) (finding that, while plaintiff's complaint "could have spelled out [his impairment's] limiting effect more clearly," a "successful ADA claim does not require 'excruciating details as to how the plaintiff's capabilities have been affected by the impairment,'" (quoting Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 24 (1st Cir.2002))).

It is true that plaintiff could have done a much better job of explaining (even briefly) the ways in which his cardiovascular and genitourinary impairments "substantially limit" his ability to perform major life activities.  For instance, the complaint contains very little about how his apparent heart condition affects his ability to work, to perform manual tasks, or to take care of himself.  Nevertheless, the Court, mindful of both the low bar for surviving motions to dismiss under the ADAAA and Congress' intent that the term "substantially limits" be broadly

interpreted, finds that the amended complaint plausibly satisfies
the third <u>Bragdon</u> step.  Plaintiff has, for example, suggested that
the blockage of his carotid artery made him dizzy on the job, and
prevented him from working for a period of six weeks.  (Docket
No. 32 at p. 4.)    Furthermore, given that plaintiff's kidney
ailment requires him to undergo dialysis treatment on a regular
basis, it is reasonable for the Court to infer that this impairment
places a substantial limitation on the major life activity of
bodily waste elimination.  <u>See</u> <u>Heiko</u>, 434 F.3d 249, 255 (finding
that plaintiff's kidney impairment placed a substantial limitation
on the major life activity of waste elimination where plaintiff
endured regular dialysis treatment).  Thus, while plaintiff will
certainly need to provide more detail in later stages of this
proceeding to establish his disability affirmatively, the Court
concludes that he has pled sufficient facts to overcome the
"easy-to-clear hurdles necessary to survive a motion to dismiss."
<u>See</u> <u>Horgan v. Simmons</u>, 704 F. Supp. 2d 814, 820 (N.D. Ill. 2010)
(internal quotations omitted).

> **b.   Second ADA Discrimination Element:  Qualified for the Position**

The second *prima facie* element of a disability
discrimination claim pursuant to the ADA will eventually require
plaintiff to establish that he was "qualified" for the position
that he held.  To establish that he was qualified, plaintiff must
demonstrate "first, that [he] had the necessary skill, experience,

education, and other job-related requirements for the . . . position and, second, that [he] was able to perform the essential functions of the position with or without reasonable accommodation." Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 75 (1st Cir. 2010) (internal quotations and citations omitted.)

Here, various allegations in the amended complaint, which the Court must accept as true, establish that Arroyo-Ruiz likely possessed the necessary skills and experience for the position that he held. Plaintiff asserts, for example, that he has been with Triple-S Insurance Company for 35 years, and that, during that time, he has held a variety of positions, including ones in management. (Docket No. 32 at p. 4.) The length of Arroyo-Ruiz's service with Triple-S, coupled with his experience in certain managerial positions, strongly suggests that he possessed the requisite job requirements and experience to serve as the staff supervisor at the Arecibo office.

With regard to whether plaintiff was able to perform the "essential functions" of the position, the Court also finds that sufficient facts have been pled to survive defendants' motion to dismiss. Plaintiff asserts that, even after his alleged heart condition began to give him trouble, he effectively "helped his team become the best performing staff in the district." (Docket No. 32 at p. 4.) Although the complaint indicates that plaintiff later began to struggle in meeting the demands of the job, certain allegations cast doubt on whether that difficulty was the result of

plaintiff's putative disability.  Rather, plaintiff suggests that
his work troubles stemmed in large part from his reassignment to a
smaller team with an inadequate staff, and the introduction of a
new sales objective which he claims was "impossible" to meet due to
a staff smaller than others.  (Docket No. 32 at p. 6.)  If this is
indeed the case, it is certainly plausible that plaintiff was still
able to perform the main responsibilities of his position.  Viewing
the facts in the light most favorable to plaintiff, then, the Court
concludes that there are sufficient allegations in the amended
complaint to support the second element of an ADA discrimination
claim.

### c.    Third ADA Discrimination Element: Causation

            The  third  and  final  element  of  a  disability
discrimination claim pursuant to the ADA requires plaintiff to show
that Triple-S Vida took adverse action against him, in whole, or in
part, because of his disability.  Roman-Oliveras, 655 F.3d at 48.
Because defendants concede that Arroyo-Ruiz was subject to an
adverse employment action, "to wit, his discharge from his Triple-S
Vida employment," (Docket No. 20 at p. 16), the critical question
is whether plaintiff's allegations establish a plausible nexus
between his disability and that discharge.  The Court believes that
they do.

            It is, of course, impossible to tell from the
amended complaint that plaintiff's disability was the cause of his
termination.  What is not impossible to tell, however, is that the

circumstances surrounding plaintiff's termination are somewhat confusing and suspicious. According to the amended complaint, plaintiff's termination letter stated that he was being released for taking unauthorized vacation time and insubordination. (Docket No. 32 at p. 8.) Plaintiff alleges, however, that he had received "papers authorizing" his vacation, and that, even before his departure, supervisor Rodriguez had informed him that "he would no longer have a staff" when he returned. Id. The puzzling and suspect nature of this scenario suggests that Triple-S Vida's proffered reason for terminating plaintiff could in fact be a pretextual excuse intended to hide a discriminatory motive. Thus, viewing the facts in the light most favorable to plaintiff, the Court concludes that there is a plausible causal connection between Arroyo-Ruiz's disability and the adverse action he suffered. Accordingly, the third and final element of an ADA discrimination claim is satisfied.

The Court hastens to add that it offers no view on the merits of plaintiff's claim. The question at the motion to dismiss stage is not "the likelihood that a causal connection will prove out as fact." Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico, 628 F.3d 25, 30 (1st Cir. 2010). Rather, "the standard is plausibility assuming the pleaded facts to be true and read in a plaintiff's favor." Id. Here, the pleaded facts support "[a] plausible but inconclusive inference" of discrimination based on disability, Id., and Arroyo-Ruiz is therefore entitled to

proceed with his ADA discrimination claim.  Defendants' motion to
dismiss with respect to that particular cause of action is
therefore **DENIED**.

**C.    ADA Retaliation Claim**

**1.    The Parties' Contentions**

For his second cause of action, plaintiff asserts that he
was subject to "further retaliatory actions" upon complaining of
harassment against him.  (Docket No. 32 at p. 11.)  Those actions
included, but were not limited to, "increasing workload and the
removal of his molding assistant."  Id.  Defendants argue that the
plaintiff's allegations do not satisfy all the elements of the
applicable legal test, as discussed below.   (Docket No. 20 at
p. 25.)  More specifically, they contend that the actions denounced
by the plaintiff are not "actionably adverse" and that, even if
they are, there are insufficient facts showing a "causal link
matching up the protected activity to any of [those actions]."  Id.
For the reasons discussed below, the Court agrees with defendants.

**2.    Analysis**

The ADA's retaliation provision makes it unlawful to
"discriminate against any individual because such individual has
opposed any act or practice made unlawful by [the ADA] or because
such individual made a charge, testified, assisted, or participated
in any manner in an investigation, proceeding, or hearing under
[the ADA]."  42 U.S.C. § 12203(a).  In order for Arroyo-Ruiz to
establish an ADA retaliation claim, he "must show that (1) [he]

engaged in protected conduct, (2) [he] suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action." Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011).

### a.   Protected Conduct

Complaining of discrimination on the basis of a disability is protected conduct for purposes of the ADA's retaliation provision. Valle-Arce v. Puerto Rico Ports Auth., 651 F.3d 190, 198 (1st Cir. 2011). This includes informal complaints, as well as more formal filings and proceedings. See, e.g., Torres-Alman v. Verizon Wireless Puerto Rico, Inc., 522 F. Supp. 2d 367, 394 (D.P.R. 2007)(Lopez, J.)(finding that informal complaints about disability discrimination to management and supervisors constituted protected conduct.)  In this case, although plaintiff did not participate in any formal investigation or file any sort of administrative claim, he did contact the Triple-S human resources department in July of 2013 to complain about discrimination he suffered while at the Arecibo office.  (Docket No. 32 at p. 7.) This action constitutes protected conduct in satisfaction of the first prong of an ADA retaliation claim.

### b.   Adverse Employment Action

A plaintiff suffers from an adverse employment action if he or she is subjected to "[a]n adverse action [that] . . . carries tangible consequences. At bottom, it involves . . . a material change in terms and conditions of employment . . . ."

Civil No. 15-1741 (FAB)                                              26

Echevarria v. AstraZeneca, LP, 133 F. Supp. 3d 372, 394 (D.P.R.
2015) (Delgado-Hernandez, J.).   "While termination of employment
obviously is an adverse employment action," Valle-Arce v. Puerto
Rico Ports Auth., 651 F.3d 190, 198 (1st Cir. 2011), an increase in
workload does not necessarily constitute an adverse employment
action for purposes of the ADA.   See e.g., Marrero v. Goya of
Puerto Rico, Inc., 304 F.3d 7, 23-25 (1st Cir. 2002) (the fact that
plaintiff was required to do more work under extreme supervision
did not rise to level of an adverse employment action).

           Here, plaintiff contends that after he complained of
discrimination to human resources in July of 2013 his workload
increased, presumably because of the removal of his "molding
assistant." (Docket No. 32 at p. 11.)   Plaintiff also implies that
his complaint eventually led to his termination in April of 2014.
Id. at pp. 8, 11.   Although plaintiff's bare allegation of an
increased workload is not sufficient to establish an "adverse
employment action" under the ADA, his termination certainly
qualifies as such.   Thus, plaintiff's allegations have satisfied
the second element of a retaliation claim.

           c.   **Causal Connection**

           The third element of a retaliation claim will
eventually require Arroyo-Ruiz to show a nexus between his
protected conduct - the complaint to human resources in July of
2013 - and the adverse employment action that he suffered - his
termination in April of 2014.   When, as now, there is a lack of

direct evidence of a causal link between plaintiff's protected conduct and the adverse employment action, courts look to temporal proximity to satisfy the causal connection element. See Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 25 (1st Cir. 2004). The United States Supreme Court has observed, however, that in cases where mere temporal proximity between an employer's knowledge of protected activity and an adverse action is accepted as sufficient evidence of causality, the proximity "must be very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotation marks omitted). In line with the Supreme Court's observation, the First Circuit Court of Appeals has determined that a "tight fit" is required, and that "a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action." Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010); see also Calero-Cerezo, 355 F.3d at 25 (noting that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity"); Murray v. Warren Pumps, LLC, 821 F.3d 77, 88 (1st Cir. 2016) (holding that employee's complaints to a human resources officer about disability harassment, which occurred six months to a year prior to termination of employment, were "too remote in time" to support the causal connection element for retaliation.)

          Here, Arroyo-Ruiz alleges that in July of 2013, he contacted human resources to report Rodriguez's discriminatory

behavior. (Docket No. 32 at pp. 6-7.)  He did not receive his termination letter, however, until April 2014. Id. at p. 8.  Thus, approximately nine months elapsed between plaintiff's protected conduct and the adverse employment action against him.  Because three and four month gaps have been deemed insufficient to support an inference of causality in the First Circuit, the nine-month period here between the protected conduct and the adverse action clearly cannot satisfy the causation prong of an ADA retaliation claim.  Accordingly, defendants' motion to dismiss that particular cause of action is **GRANTED**.

**D.  ADA Hostile Work Environment Claim**

   **1.   The Parties' Contentions**

      Arroyo-Ruiz alleges that the defendants "allowed and promoted a pattern of harassment because of his disability" that essentially produced a hostile work environment in violation of the ADA. (Docket No. 32 at p. 9.)  He seeks to substantiate this claim in his amended complaint by pointing to:  (1) supervisor Rodriguez's consistent remarks in front of the whole office staff that the office would work better if plaintiff were not working, (2) constant comments made by Rodriguez and other staff members with respect to plaintiff's deteriorating health, (3) a general practice within the office, encouraged by Rodriguez, of harassing and ridiculing staff members who attempted to defend plaintiff, and (4) Rodriguez's repeated requests for plaintiff to transfer voluntarily to another office or to retire.  Id. at pp. 4-6.

Defendants argue that plaintiff's allegations fail to satisfy all necessary elements of the applicable legal standard, as discussed below.  (Docket No. 20 pp. 22-23.)   The Court disagrees.

**2.   Analysis**

Hostile work environment claims brought under the ADA have been analyzed in the district court using the standards applied to similar claims brought under Title VII.  See Blasco Figueroa v. Puerto Rico Aqueducts & Sewer Auth., 2016 WL 1122003, at *6 (D.P.R. Mar. 22, 2016) (Gelpi, J.).  The Title VII standard requires an employee to prove that:  (1) he was disabled within the meaning of the Act; (2) he was subject to unwelcome harassment because of the disability; (3) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (4) the employer knew or should have known about the harassment but failed to take prompt remedial action.  Id.; see also Rodriguez-Fonseca v. Baxter Healthcare Corp. of P.R., 899 F. Supp. 2d 141, 152 (D.P.R. 2012) (Dominguez, J.).

The Court has already established that Arroyo-Ruiz is plausibly disabled within the meaning of the ADA.  Plaintiff's allegations also suggest that the harassment he allegedly faced was related to his medical conditions and his "degrading health." (Docket No. 32 at p. 5.)  Additionally, the fact that Arroyo-Ruiz contacted the human resources department to complain about "everything that had been happening since he began working in the Arecibo office and that Mr. Rodriguez was harassing him" indicates

that Triple-S Vida knew or should have known about the ongoing harassment. (Docket No. 32 at p. 7.)  The essential issue before the Court, therefore, is whether plaintiff has pled enough facts to support a plausible claim that the harassment was "sufficiently severe or pervasive."

To determine whether harassing conduct is sufficiently severe or pervasive, courts consider the totality of the circumstances, including the severity and frequency of the conduct and whether it unreasonably interfered with the plaintiff's work performance.  See Colon-Fontanez v. Mun. of San Juan, 660 F.3d 17, 43-44 (1st Cir. 2011).  Case law is clear, however, that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment to establish an objectively hostile or abusive work environment."  Id. at 44 (internal citations and quotations omitted.)

Here, plaintiff contends that the harassment was "constant" in nature, and that it was performed, facilitated and encouraged by a company supervisor, often in front of the whole office.  (Docket No. 32 at p. 4-5.)  He also alleges that co-workers who attempted to come to his defense were in turn made the targets of ridicule.  Id. at p. 5.  These assertions allow the Court reasonably to infer that the alleged harassment did not consist either of "isolated incidents" or "simple teasing," but rather occurred on a regular basis and was humiliating to

plaintiff.   The  fact  that  a  Triple-S  vice  president  visited
plaintiff's  office  to  discuss  his  "decreasing  performance"  also
suggests  that  Mr.  Rodriguez's  actions  were  having  a  genuinely
detrimental  effect  on  Arroyo-Ruiz's  productivity.   (Docket  No.  32
at  p.  6.)   Viewing  the  complaint  in  the  light  most  favorable  to
plaintiff,  the  Court  therefore  finds  that  plaintiff's  allegations
adequately  demonstrate  the  type  of  pervasive  harassment  needed  to
support  a  plausible  claim  of  hostile  work  environment  pursuant  to
the  ADA.   See  Quiles-Quiles v. Henderson,  439  F.3d  1,  7  (1st  Cir.
2006)  (affirming  hostile  work  environment  finding  where  plaintiff
"was  subject  to  daily  ridicule  about  his  mental  impairment");
Arrieta-Colon v. Wal-Mart P.R., Inc.,  434  F.3d  75,  89  (1st  Cir.
2006)  (same,  where  plaintiff  was  subject  to  "constant  mockery  and
harassment . . . by  fellow  co-workers  and  supervisors  alike  due  to
his  condition").   Accordingly,  defendants'  motion  to  dismiss  with
respect  to  that  specific  cause  of  action  is  **DENIED.**

**E.   Title VII Discrimination Claim**

     In  addition  to  his  various  ADA  claims,  plaintiff  also  advances
a  claim  of  hostile  work  environment  in  violation  of  Title  VII.
(Docket  No.  32  at  p.  10.)   The  Court  notes,  however,  that  the  facts
presented  by  plaintiff  in  his  amended  complaint  do  not  bring  this
case  within  the  purview  of  that  law.   Title  VII  makes  it  "an
unlawful  employment  practice  for  an  employer  to . . . discriminate
against  any  individual  with  respect  to  his  compensation,  terms,
conditions,  or  privileges  of  employment,  because  of  such

individual's race, color, religion, sex, or national origin."
42 U.S.C.A. § 2000e-2(a)(1).  As defendants correctly note in their
motion to dismiss, "[a] plain reading of the statute reveals that
Title VII bars only discrimination on the basis of race, color,
religion, sex, and national origin, and does not provide a cause of
action for claims of age or disability discrimination."
Torres-Alman v. Verizon Wireless Puerto Rico, Inc., 522 F. Supp. 2d
367, 381 (D.P.R. 2007) (Lopez, J.).  In his amended complaint,
plaintiff focuses solely on discrimination, harassment, and
retaliation that he suffered as a result of his alleged disability,
and does not present any protected category specified in Title VII.
Accordingly, his hostile work environment claim based on Title VII
is **DISMISSED**.

### F.   **Puerto Rico Law 115 Claim**

Plaintiff alleges that his termination in April, 2014 also
constituted an act of retaliation in violation of Puerto Rico
Law 115.  (Docket No. 32, at p. 3, 12.)  P.R. Law 115 provides that
"[n]o employer may . . . discriminate against an employee regarding
the terms, conditions, compensation, location, benefits or
privileges of the employment should the employee offer or attempt
to offer, verbally or in writing, any testimony, expression or
information before a . . . judicial forum in Puerto Rico . . . ."
P.R. Laws Ann. tit. 29, § 194a(a).  "In order to prevail on a claim
under Law 115, a plaintiff-employee must show that she engaged in
protected activity and that she was thereafter discriminated

against regarding her employment." <u>Velez v. Janssen Ortho, LLC</u>, 467 F.3d 802, 809 (1st Cir. 2006). With respect to the "protected activity" prong, the First Circuit [Court of Appeals] has emphasized that "Law No. 115 protects only testimony, expression or information . . . before a legislative, administrative, or judicial forum, not internal complaints." <u>Villanueva-Batista v. Doral Fin.</u> <u>Corp.</u>, 357 F. App'x 304, 306 (1st Cir. 2009).

Here, plaintiff complained to the Triple-S human resources department in July of 2013, but did not offer or attempt to offer testimony or information to a legislative, an administrative, or a judicial forum. Because he did not engage in any activity protected by Law 115, his cause of action pursuant to that provision is **DISMISSED**.

## H.  **Puerto Rico Law 100 Claim**

The plaintiff also includes a claim pursuant to Puerto Rico Law 100. (Docket No. 32 at p. 12.) That provision, however, concerns "discrimination based on age, race, color, sex, sexual orientation, gender identity, social or national origin, social condition, political affiliation, political or religious beliefs, or for being a victim or perceived as a victim of domestic violence, sexual assault or stalking." P.R. Laws Ann. tit. 29 § 146. Because none of those protected categories is at issue in this case, plaintiff's Law 100 claim is **DISMISSED**.

## I.   **Puerto Rico Law 80 Claim**

Next is plaintiff's claim pursuant to Puerto Rico Law 80.  Law 80 is Puerto Rico's Wrongful Dismissal Act.  It provides relief to employees who are terminated "without good cause" as the term is defined in the Act.  P.R. Laws Ann. tit. 29 § 185a.  The initial burden for a Law 80 claim is on a plaintiff to establish that he or she was dismissed and that his or her dismissal was unjustified. Hoyos v. Telecorp Commc'n., Inc., 488 F.3d 1, 6 (1st Cir. 2007).

Considering the content of the amended complaint, the Court finds that plaintiff can plausibly establish a claim pursuant to Law 80.  It is uncontested that plaintiff was terminated by Triple-S Vida.  Furthermore, as discussed above, plaintiff's claim for disability discrimination pursuant to the ADA is supported by sufficient factual allegations to survive defendants' motion to dismiss.  Because the discharge of an employee on the basis of his or her disability is not made with "good cause,"[2] plaintiff may plausibly be able to prove an entitlement to relief pursuant to Law 80.  Defendants' motion to dismiss with respect to that claim is therefore **DENIED.**

---

[2] Section 185b of Law 80 gives examples of good cause for terminating a worker, including when the employee exhibits a "pattern of improper or disorderly conduct," or an "attitude of . . . not performing his work in an efficient manner." P.R. Laws Ann. tit. 29 § 185b(a), (b) (2003).  Termination solely on the basis of the employee's disability is, unsurprisingly, nowhere to be found among those examples.

**J.   Claims Pursuant to Articles 1802 & 1803 of the Puerto Rico Civil Code**

Plaintiff's final cause of action is brought pursuant to Articles 1802 and 1803 of the Puerto Rico Civil Code.  Article 1802 is Puerto Rico's general tort statute and provides that a person who "causes damage to another through fault or negligence shall be obliged to repair the damage so done."  P.R. Laws Ann. tit. 31, § 5141.  Article 1803 extends liability to employers for damages caused by their employees.  Id. § 5142.  When a plaintiff brings claims covered by a specific labor or employment law, however, the Puerto Rico Supreme Court and courts in this district bar plaintiffs from bringing claims pursuant to Articles 1802 and 1803 based on the same alleged conduct.  See Franceschi-Vazquez v. CVS Pharmacy, Civ. No. 14-1694 (FAB), 2016 WL 1698292, at *8 (D.P.R. April 27, 2016) (Besosa, J.) (citing cases); Pagan Colon v. Walgreens of San Patricio, Inc., 190 P.R. Dec. 251, 260 (2014).

Here, Arroyo-Ruiz fails to allege any negligent or intentional conduct on the part of Triple-S Vida separate from that covered by specific employment laws.  He alleges that he was harassed and discriminated against on the basis of disability and that he was subject to an adverse employment action when he complained to the human resources department.  All of this alleged conduct is covered by plaintiff's ADA and Law 80 claims.  Accordingly, defendants' motion to dismiss plaintiff's Article 1802 and 1803 claims is **GRANTED**.

**IV.   CONCLUSION**

For the reasons discussed above, the Court **DENIES** defendants' 12(b)(1) motion and **DENIES** defendants' 12(b)(6) motion with respect to plaintiff's ADA discrimination, ADA hostile work environment, and Puerto Rico Law 80 claims.   (Docket No. 20.)   Defendants' 12(b)(6) motion with respect to plaintiff's ADA retaliation, Title VII, Law 115, Law 100, and Articles 1802 & 1803 claims is **GRANTED.** (Docket No. 20.)   Those claims are **DISMISSED WITH PREJUDICE.**

Partial Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, September 12, 2016.

                                        s/ Francisco A. Besosa
                                        FRANCISCO A. BESOSA
                                        UNITED STATES DISTRICT JUDGE